**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TEDD NAVARRO, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | |
| v. | CLASS ACTION |
| OSCAR HEALTH, INC. and OSCAR MANAGEMENT CORP., | JURY TRIAL DEMANDED |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff Tedd Navarro ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendants Oscar Health, Inc. and Oscar Management Corp. ("Oscar" or "Defendants"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

**INTRODUCTION**

1.      Plaintiff brings this class action against Defendants for their failure to secure and safeguard approximately Plaintiff's and others' personally identifying information ("PII") and personal health information ("PHI"), including names, health insurance policy numbers, and health insurance plan information.

2.      Oscar is a healthcare technology and health insurance company headquartered in New York, New York.

3.      On or about December 31, 2025, Oscar discovered that identification cards and other enrollment information belonging to members, including Plaintiff and Class members, had been mailed to old or incorrect member addresses (the "Data Incident").

4. Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate safeguards, policies, and procedures to protect their PII/PHI from unauthorized access, disclosure, and misuse. Defendants breached that duty by, among other things, failing to maintain reasonable security procedures and practices designed to ensure that Plaintiff's and Class members' PII/PHI was not sent to unauthorized recipients or otherwise disclosed without authorization.

5. As a result of Defendants' inadequate safeguards and their breach of their duties and obligations, the Data Incident occurred, and Plaintiff's and Class members' PII/PHI was improperly disclosed to unauthorized persons. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Incident.

6. Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### *Plaintiff Tedd Navarro*

7. Plaintiff is a citizen and resident of Florida.

8. Plaintiff was a member or enrollee in an Oscar health insurance plan. In connection with Plaintiff's enrollment in and receipt of health insurance coverage, Oscar collected, stored, maintained, used, and transmitted Plaintiff's PII/PHI, including information associated with Plaintiff's health insurance coverage and enrollment.

2

9.      Plaintiff received a notice letter from Oscar notifying him that his PII/PHI was mailed to old or incorrect member addresses.

10.     Shortly after the Data Incident occurred, Plaintiff found suspicious activity on his credit report that he did not initiate. The report noted that he had a debt of approximately $386 which he owed to a bank that he did not create an account with. He believes a fraudulent credit card account was created in his name to take out this debt. He also discovered an attempted charge to Verizon in his name which he did not authorize. After discovering these fraudulent charges, Plaintiff was forced to spend time trying to dispute the fraud. The issue has not yet been resolved.

11.     After discovering the fraudulent activity in his name, Plaintiff paid for a credit monitoring/repair service.

12.     As a direct result of the Data Incident, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Incident; and deprivation of the value of his PII/PHI.

### *Defendant Oscar Health, Inc.*

13.     Defendant Oscar Health, Inc. is a Delaware corporation with its principal place of business located at 75 Varick St., 5th Floor, New York, NY 10013.

### *Defendant Oscar Management Corp.*

14.     Defendant Oscar Management Corp. is a Delaware corporation with its principal place of business located at 75 Varick St., 5th Floor, New York, NY 10013.

## JURISDICTION AND VENUE

15.    The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

16.    This Court has general personal jurisdiction over Defendants because they maintain their principal place of business in this District.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants' principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Oscar*

18.    Oscar is a healthcare technology company that offers health insurance plans and related health technology services.[1] Oscar Health, Inc. is the parent company of Oscar Management Corp.

19.    In the regular course of its business, Oscar collects and maintains the PII/PHI of its members and applicants in connection with enrollment, coverage, and plan administration.

---

[1] *Investor Relations*, OSCAR, https://ir.hioscar.com/overview/ (last accessed Apr. 7, 2026).

20.   22.   Oscar provides its members with a Notice of Privacy Practices (the "Privacy Notice"), which describes how Plaintiff's and Class members' PII/PHI may be used and disclosed by Oscar.[2]

21.   The Privacy Notice contains a list of instances in which it may share PII/PHI with others.[3] None of the instances include a cyberattack.

22.   Plaintiff and Class members are, or were, Oscar members or applicants whose PII/PHI was maintained by Oscar and was subject to unauthorized disclosure in the Data Incident.

23.   Oscar should have been particularly aware of the importance of careful mailing procedures because one of its vendors did the same in 2021, sending mailings intended for certain members to other members.[4]

### The Data Incident

24.   On or about December 31, 2025, Oscar discovered that member identification cards and other enrollment information related to 2026 health insurance coverage were mailed to old or incorrect member addresses. The impacted information includes names, health insurance policy numbers, and health insurance plan information.[5]

---

[2] *Notice of Privacy Practices*, OSCAR, https://assets.ctfassets.net/plyq12u1bv8a/7AsODviVJEYVMME2MDGFoG/26c3826e03f 02c44c9d86f60824851b3/20240618_OHI_Notice_of_Privacy_Practices_Updated_061824 __2_.pdf (last accessed Apr. 7, 2026).

[3] *Id.*

[4] *Notice of Data Breach*, OSCAR, https://www.hioscar.com/blog/notice-of-data-breach (last accessed Apr. 7, 2026).

[5] *See Notice of Data Privacy Event*, OSCAR, https://www.hioscar.com/en/legal/privacy-event (last accessed Apr. 7, 2026).

25.    Despite discovering the Data Incident on or about December 31, 2025, Oscar waited until approximately February 27, 2026—approximately two months after the Data Incident—to announce the Data Incident and begin notifying Plaintiff and Class members that their PII/PHI was disclosed to unauthorized persons.[6]

26.    Defendants' failure to promptly notify Plaintiff and Class members that their PII/PHI had been improperly disclosed ensured that unauthorized recipients could view, retain, misuse, or further disseminate that information before Plaintiff and Class members could take affirmative steps to protect themselves and their sensitive information. As a result, Plaintiff and Class members have suffered and will continue to suffer from a substantial and concrete risk that their identities and private health insurance information will be misused, as well as from the ongoing consequences of the disclosure of their sensitive PII/PHI.

### PII/PHI Is Valuable

27.    At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collect and store was sensitive and required extreme care. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy measures to protect Plaintiff's and Class members' PII/PHI from unauthorized disclosures and cyberattacks that it should have anticipated and guarded against.

28.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI disclosed in the Data Incident—is valuable and frequently targeted by criminals. In a recent article, *Business*

---

[6] *See id.*

*Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[7]

29.     PII/PHI is a valuable property right.[8] The value of PII/PHI as a commodity is measurable.[9] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[10] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[11] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

30.     Criminals piece together bits and pieces of compromised PII/PHI for profit by creating "Fullz" packages. "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more.

---

[7] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[8] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[9] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[10] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[11] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

31.    With "Fullz" packages, criminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

32.    The development of "Fullz" packages means here that the stolen PII/PHI from the Data Incident can easily be used to link and identify it to Plaintiff's and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI that was exfiltrated in the Data Incident, criminals may still easily create a "Fullz" package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

33.    Thus, even if certain information (such as contact information) was not compromised in the Data Incident, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to criminals.

34.    PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[12] A criminal who obtains a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[13]

---

[12] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[13] *Id.*

35.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[14] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[15]

36.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[16] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[17]

37.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made

---

[14] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[15] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[16] Steager, *supra* note 12.

[17] *Id.*

more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[18]

38.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Disclosure of PII/PHI Has Grave and Lasting Consequences for Victims*

39.    Disclosure of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[19][20]

40.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[21]

---

[18] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[19] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Apr. 7, 2026).

[20] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[21] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023),

41.    Identity theft is not an easy problem to solve. In a 2025 survey, the Identity Theft Resource Center found that 20% of victims of identity misuse needed more than 30 days to resolve issues stemming from identity theft and 13% required three months or more.[22]

42.    Theft of PII is even more serious when it includes theft of PHI. Data incidents that compromise medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[23] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[24] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[25] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[26]

---

https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[22] Identity Theft Resource Center, *2025 Consumer Impact Report*, IDENTITY THEFT RES. CTR. (2025), https://www.idtheftcenter.org/publication/itrc-2025-consumer-impact-report/ (last accessed Apr. 7, 2026).

[23] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[24] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . ., supra* note 15.

[25] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Apr. 7, 2026).

[26] *Id.*

43.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a.     Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b.     Significant bills for medical goods and services neither sought nor received.

c.     Issues with insurance, co-pays, and insurance caps.

d.     Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e.     Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f.     As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g.     Phantom medical debt collection based on medical billing or other identity information.

h.     Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[27]

44.     There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been

---

[27] *See* Dixon & Emerson, *supra* note 23.

stolen and used, but it takes some individuals up to three years to learn that information.[28]

45.    It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI was sent to persons who could potentially use the PII/PHI for harm.

### *Damages Sustained by Plaintiff and Class Members*

46.    Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Incident; (v) the continued risk to their PII/PHI which remains in Defendants' possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Incident.

### CLASS ALLEGATIONS

47.    This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

48.    Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

---

[28] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019),
 http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

All persons whose PII/PHI was disclosed in the Data Incident to unauthorized persons, including all who were sent a notice of the Data Incident.

49.    Excluded from the Class are Oscar Health, Inc. and its affiliates, parents, subsidiaries, employees, officers, agents, board members, and directors; Oscar Management Corp. and its affiliates, parents, subsidiaries, employees, officers, agents, board members, and directors; as well as the judge(s) presiding over this matter and the clerks of said judge(s).

50.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

51.    The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. On information and belief, Plaintiff believes that the Class contains thousands of Class members.

52.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

   a.  whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

   b.  whether Defendants had duties not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

   c.  whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

   d.  whether Defendants breached their duties to protect Plaintiff's and Class members' PII/PHI; and

14

e.  whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

53.    Oscar engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

54.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI disclosed in the Data Incident. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Oscar, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

55.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

56.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Oscar, so it would be impracticable for Class members to individually seek redress from Oscar's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or

contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

57.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

58.    Oscar owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

59.    Oscar knew or should have known the risks of mailing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining reasonable and adequate safeguards, policies, and procedures to prevent unauthorized disclosure of their PII/PHI.

60.    Given the nature of Oscar's business, the sensitivity and value of the PII/PHI it collects, stores, and maintains, and the resources at its disposal, Oscar should have implemented adequate safeguards and procedures to ensure that members' PII/PHI was not improperly disclosed.

61.    Oscar breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate safeguards, processes, controls, policies, procedures, and protocols

16

governing the handling, mailing, and disclosure of the PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

62.    It was reasonably foreseeable to Oscar that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate safeguards, mailing procedures, address-verification protocols, and disclosure controls, would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

63.    But for Oscar's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

64.    As a result of Oscar's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Incident, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, disclosure, and publication of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Incident; (v) the continued risk to their PII/PHI which remains in Oscar's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Incident.

## COUNT II
## NEGLIGENCE PER SE

65. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

66. Oscar's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

67. Oscar's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as Oscar, of failing to employ reasonable measures to protect and secure PII/PHI.

68. Oscar violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and other Class members' PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. Oscar's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of unauthorized disclosure of PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

69. Oscar's violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

70. Plaintiff and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

71. The harm occurring as a result of the Data Incident is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Incident.

72. It was reasonably foreseeable to Oscar that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate safeguards, mailing procedures, address-verification protocols, and disclosure protocols, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

73. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Oscar's violations of the HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, disclosure, and publication of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future

19

consequences of the Data Incident; (v) the continued risk to their PII/PHI which remains in Oscar's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Incident.

**<u>COUNT III</u>**
**BREACH OF IMPLIED CONTRACT**

74. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

75. In connection with receiving insurance services, Plaintiff and all other Class members entered into implied contracts with Oscar.

76. Pursuant to these implied contracts, Plaintiffs and Class members paid money to Oscar and provided Oscar with their PII/PHI. In exchange, Oscar agreed to, among other things, and Plaintiffs and Class members understood that Oscar would: (1) provide insurance services to Plaintiff and Class members; (2) collect, maintain, and utilize Plaintiff's and Class members' PII/PHI to, among other things, facilitate treatment, the provision of services, and payment services to Plaintiff and Class members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; (4) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations, industry standards, and Oscar's representations; and (5) maintain the confidentiality of Plaintiff's and Class members' PII/PHI and protect it from unauthorized disclosure and misuse.

77. The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and Oscar, on the other

hand. Indeed, as set forth *supra*, Oscar recognized the importance of data security and the privacy of its customers' PII/PHI in its Privacy Notice. Had Plaintiffs and Class members known that Oscar would not adequately protect their PII/PHI, including by sending their PII/PHI to unauthorized persons, they would not have agreed to provide Oscar with their PII/PHI or received insurance services Oscar.

78.     Plaintiffs and Class members performed their obligations under the implied contract when they provided Oscar with their PII/PHI and paid for insurance services from Oscar.

79.     Oscar breached its obligations under its implied contracts with Plaintiffs and Class members in failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate safeguards, mailing procedures, address-verification protocols, and disclosure controls, that resulted in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

80.     Oscar's breach of their obligations of its implied contracts with Plaintiffs and Class members directly resulted in the Data Incident and the injuries that Plaintiffs and all other Class members have suffered from the Data Incident.

81.     Plaintiffs and all other Class members were damaged by Oscar's breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were

deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Incident, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

**COUNT IV**
**UNJUST ENRICHMENT**

82.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

83.    Plaintiff alleges this claim in the alternative to the Breach of Implied Contract claim.

84.    Plaintiff and Class members conferred a monetary benefit upon Oscar in the form of premiums and other payments made for health insurance coverage and related services, as well as through the provision of their PII/PHI, which was necessary for Oscar to enroll them, administer their coverage, and provide its services. Plaintiff did so with the implicit understanding that a portion of those payments would be used to implement and maintain adequate safeguards to protect Plaintiff's and Class members' PII/PHI from improper disclosure.

85.    Oscar accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Oscar benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to enroll members, administer health insurance coverage, maintain member accounts, and provide member communications and related services.

86.     As a result of Oscar's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that they paid for and expected, and those payments without reasonable data privacy and security practices and procedures that they received.

87.     Oscar should not be permitted to retain the money belonging to Plaintiff and Class members because Oscar failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members expected and that were otherwise mandated by federal, state, and local laws and industry standards.

88.     Plaintiff and Class members have no adequate remedy at law.

89.     Oscar should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Incident alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A.     Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.     Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

23

C.      Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data incident by adopting and implementing best data protection practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: April 7, 2026                             Respectfully submitted,

/s/ *Adam Pollock*
Adam Pollock
**POLLOCK COHEN LLP**
111 Broadway, Suite 1804
New York, NY 10006
Tel: 212-337-5361
adam@pollockcohen.com

Ben Barnow
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000

24

Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff*